We will hear argument this morning in case 241260, Watson v. Republican National Committee. Mr. Stewart. Mr. Chief Justice, and may it please the Court, states have broad power over elections. Throughout our history, they've used that power to change how they hold elections. Nowhere is that change more apparent than in Election Day itself. Congress set the federal Election Day in 1845. At the time, everyone voted in person. There was no absentee voting. There was no secret ballot. Voters challenged each other's qualifications at the polls on Election Day. And states received ballots on Election Day. Over time, states changed all those practices. They did so as Congress extended Election Day to all federal offices. They've done so ever since. No one claims that in setting the federal Election Day, Congress blocked most of those changes. The dispute is whether Congress blocked just one change, allowing ballots cast by Election Day to be received after that day. States have allowed that for over a century. Congress has respected it. No one challenged it until now. The question is whether Congress in 1845 blocked that practice. The answer is no. The Election Day statutes adopt a simple rule. States must make a final choice of officers by Election Day. That is the plain meaning of an election. As this Court said in United States v. Classic, from time immemorial, an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates. Mississippi satisfies that rule. It makes a choice on Election Day. And only that rule respects the last 180 years of state lawmaking. If Election Day must be what it was in 1845, that takes out much more than the ballot receipt laws of 30 states today. It dooms absentee voting, modern methods of voting, the secret ballot, and more. Congress did not adopt that destabilizing view when it simply set the Election Day. If this Circuit was wrong to rule otherwise, this Court should reverse. I welcome the Court's questions. Just to be clear, you said in your opening statement, sometimes you said the choice has to be made by Election Day, and at other points you say on Election Day, which is it? I think the statewide choice needs to be made on Election Day itself when the entire electorate has voted, Justice Thomas. I think voters themselves need to make their individual selections by Election Day. If I give my mail-in ballot to my neighbor, is that a choice? It's a choice. It's not a final choice that can be recognized in the context of an election. So when do I know whether or not a choice is final? When you've submitted to the state, to the appropriate state election official, through the designated state process. So why isn't it the rule then that the final or the formalized decision, electoral decision, isn't made until that's done? Until it's submitted to the official, Your Honor. I think the choice is made once the voters as a whole have made an irrevocable decision. What does that mean? A final choice. Well, if I made a final choice when I handed it to my neighbor. But it's a final choice within an official state process, Justice Thomas. Well, I think the ballot is an official state process. Is that enough? Not enough to be known in a public way to the state. That happens when it is parted with and submitted through mail to the appropriate election official. Then it's final. If day includes a period after a particular day of the election, does it include a particular day before the day of the election? Or does your logic require a different consideration? Forgive me if I may not be understanding the question correctly, Your Honor. But I think the key is that the election day is the day by which a final choice electorate-wide must be made. It can't be made after that day by voters or the electorate as a whole. But individual selections can surely be made before that day, because there's still no final choice until you have an electorate-wide deadline. Is there any limit to that as to how early people could vote? Sure. You know, they fell out of the ballot if you're giving them a ballot and, you know, drop it off two weeks before. As far as the federal election day statutes are concerned, Your Honor, I don't think there is a limit to how early that could occur. I think you just need the day when the electorate as a whole needs to have chosen. There might be other practical or other barriers in that. And, of course, elections are a very long process to begin with, the entire electoral process. Surely things are happening weeks and months before. But I think even a couple weeks before, even earlier than that in some cases, people are making individual selections. It's just election day itself is the day for the final collective choice. Counsel, I want to go back to your answers to Justice Thomas. So I understand that Mississippi's particular rule says that it has to be deposited in USPS or with a common carrier. But I don't understand why Mississippi's definition in the next case would preclude a state from adopting a law along the lines of the one that Justice Thomas is proposing. For example, if I have someone in my neighborhood, in my HOA, who says, listen, I'm going to take everybody's votes in, what if the state said that's fine if you've cast your final vote and you've, you know, you've designated someone to carry your vote to, as long as it gets to the ballot box five days after election day, it's fine. Why does your definition preclude what Justice Thomas hypothesized? Right. And I think, Justice Barrett, the answer is that submission to mail or common carrier is different in kind than, say, submitting it to a relative or sort of a neighbor. What's the difference? They're not government officials. They are impartial third parties that have a duty to deliver what they're owed without altering it. But what about the definition that you're proposing precludes that? Your definition didn't say final as submitted to an impartial third party or final as submitted to a common carrier. You said the final choice has been made. And there are lots of different ways, it seems to me, that you can make a final choice, and you also have the problem of this replicability from the Postal Service, that regulation. So I think, to start with the first part, Your Honor, I mean, I think we're going at a historically recognized form of finality. I think history is helpful in a number of ways. And one way is that as long as we've had mail-in voting, we've, for almost as long as that time, we've had post-election day ballot receipt. I mean, mail-in voting, I think, in general, has been understood as a permissible, unchallenged method. I wouldn't rely on the history, if that were you, since you're telling us not to rely on the other side's history, like just because it's always been done that way doesn't mean it has to be done that way, which I actually find is a good point in your favor. But then it seems to me that you're flipping back around and saying, well, absentee voting has always been done that way by common carrier, and so that's how we would expect it to be done. Well, I think it says something that for 100 years we've had people voting by mail, and that's been an understood means of submitting a ballot to the state. I think what it embodies, Justice Barrett, is there's an intuition that when you put something through the postal service, it's final, it's trusted, it's not like giving it to kind of a non-official third party. What if a state came up with a law that said so long as a notary, that's official, that's recognized, certified that you cast your ballot on election day and it was delivered later by whatever means, common carrier or not, what in your theory of the preemptive effect of this statute would preclude that law? I think two points on that, Justice Gorsuch. One I think is that— Pick your best. Well, I think one's kind of a point in our favor and one's kind of a point against our friends, which is that there's a finality of submitting it to an official and— Yeah, it's been notarized by, well, how about a justice of the United States Supreme Court? Is that official enough for you? I mean, it's pretty official. I don't think it's been— It's pretty official. It's pretty good, Your Honor, but I don't think it kind of hits submission to the state. Ah, okay. Well, I wanted to explore—so that's not submitted to the state. Even if it's notarized, an affidavit, it was final on the day of, and somebody brings it into the state offices a week or three months later, that doesn't count. But if it goes into the mail, it does. What in the statute—what words in the statute would you have us read that into, that rule into? Well, I mean, I think—just to make sure I understand, I think that's fine under my friend's view, too, Your Honor. I mean, a notary could be— I'm asking about your view, counsel. Sure. So I think— You're saying that's not fine, and I want to understand what federal law preempts that. Well, I think, number one, I just am not—at least as I'm understanding the hypothetical, it doesn't appear to be submission to the state, Your Honor. Oh, it gets submitted to the state three weeks later, just not by common carrier. Well, I mean, if what you're saying, Your Honor, is that a notary has been deemed a sufficient ballot receiver under state law, then I think— Yes. Then that's okay, too. Okay, what if state law—so now you're saying that is okay. I think it may depend on how—what the level of officiality is. Well, the state says it's official, by God, when a Supreme Court justice or perhaps just a notary says it's official. That's good enough under your—it has to be, I think. And if that's okay, why can't a state say, how about a timestamp video showing that I voted on Election Day? Here I am filling out my ballot, and then my brother or maybe some aggregator of ballots brings it in a week or three later. That's got to be okay, too, doesn't it? I think it's still just—I keep coming back, Justice Gorsuch, to this pedigree of submitting it to a state. I mean, I think as a good example— Well, the state says that's official. The state says that's fine. Ballot aggregators are great. And so long as it's a timestamp video or a notary or maybe a Supreme Court— who knows what, the librarian says you cast it on the day of the election, we're good to go, right? I do still have some concern that it has not been submitted— Counsel, why are you fighting the premise? In the Civil War, at least two states permitted military officers who weren't sworn state officials— they were federal officials but not sworn state officials— to accept the ballots and transmit it by mail to the state, okay? And that was in the Civil War, all right? Since 1918, we've had laws like Mississippi. By 1944, eight of them. Since then, 12 more by 1886. And now half the states permit absentee ballots that are dropped in the mail, correct? No different than in the Civil War. We have no federal law that says that's not okay for the state to designate someone by whom an official ballot has to be given by election day, correct? And if the state wants to make it a notary republic, if it wants to make it a military officer, if it wants to make it a Supreme Court justice, if it wants to make it anyone, as long as it's done by election day, that's what counts, correct? I mean, I think that's possible. We're not quite asking for that, Your Honor, I really don't— No, you don't, because you're only defending this law. And this law is very consistent with what happened in the Civil War. It's very consistent with what has happened for over 100 years. There's nothing in federal law that has prohibited it explicitly, correct? That's right, Your Honor. Justice Sotomayor is asking you what I think she intends to be a friendly question, but maybe you want to think about whether you want to go that far. What if the state designates an official of the Republican Party or the Democratic Party who receives these ballots, collects ballots, and fills out an affidavit saying, I received all these and I will faithfully deliver them, would that be okay? Well, I think it's actually okay under my friends' view, Your Honor. We're not making that ask. As far as my friends' view are concerned, so long as somebody's designated a ballot receiver, they can be fine. Party boss, party bag man, relative, any of those, so long as the state says you are a ballot receiver, that's fine. The only thing that apparently is not fine is U.S. Postal Service common carrier. And I think that is a very odd way to read those. Well, the Postal Service is not part of the state, and the common carrier isn't part of any government. That's right, Your Honor. But, I mean, certainly we all know the status of the U.S. Postal Service as a highly regulated government entity with certain obligations. Common carriers in a very similar way, highly regulated with similar obligations. And they give, in both cases, they're imbued with a duty to deliver what they receive. And, in fact, a duty that's, I think, a good example, maybe a good example is the fact that the IRS accepts tax returns, which are obviously highly consequential documents with key timeliness requirements. The IRS accepts tax returns both through the mail and through common carriers. Well, you will accept ballots that are received within five days after Election Day, whatever, the date that's set as Election Day, right? That's right, Your Honor. And you have a variety of line-drawing problems. So we've been exploring, one, to whom and by what means is this thing, is the ballot to be delivered to the state? But how, what about the length of time that a state could choose? Is it the case, isn't it the case that some state allows, will count ballots that are received 21 days after Election Day? There are a couple that, at the outlier, it's kind of canvassing and it can go that far. I think more common... Is that okay? Is that all right? As far as the federal Election Day statutes are concerned, yes, Your Honor. I think this actually gets to a good point that loops back to something Justice Gorsuch was mentioning, was getting at in a certain way, which I think he was saying, it wasn't the federal Election Day statutes decides that. I think that's a key point in our favor. This is an area where states get to go first, make these decisions. Congress can step in. So there's no limit, except, I suppose, the day when presidential electors have to be appointed or the day when the next Congress begins, starts its session. That's the only limit on counting mail-in ballots? Those are some of the limits, Your Honor. But I'd also say the federal Election Day statutes don't require states to count ballots at all. It doesn't speak to counting, period. So, I mean, if a state really didn't want... Not counting, but being delivered. So I do think it is a consequence, and you can tell me if I'm wrong, but just so we can wrap this up, that by any means and by any date up until the next Congress meets, a state can receive ballots. I think for congressional races, potentially, yes, Your Honor. I think there are other Title III kind of things that push action earlier in the presidential context. But, again, I mean, there's nothing... The key question is, these are three one-sentence provisions, and we want to be, I think, very careful not to read them for more than they're worth. And, Counsel, I was just going to say, isn't your point that the line-drawing issues that have been raised are only problems to the extent that Congress thought they were problems? We're in a preemption dynamic. And so the question, I think, really is, what did Congress intend with its statement about Election Day? Did it mean to cabin the states so that they did not have the discretion to make these kinds of decisions? And in addition to what Justice Sotomayor has said, which is we have no federal statute that precludes this, I think we have several federal statutes that suggest that Congress was aware of post-Election Day ballot deadlines that the states had enacted and, in fact, incorporated those in several circumstances. So can you speak to that? I'm talking about UOCAVA, for example, and some other federal statutes that indicate that Congress not only knew this was going on, but then it interpreted and incorporated the states' own post-Election Day ballot deadlines into federal law. Sure, Your Honor. So I think that's exactly right. So UOCAVA is maybe the best example where Congress was told that about a dozen or so states have post-Election Day ballot receipt laws. It respected those explicitly as to a deadline for ballots in that law. I think the United States has agreed with us on that very point. And Congress wasn't worried, I think, about the states picking dates that were, you know, we might think are too long or whatnot. That was not in the statute. Congress just said whatever the state has decided with regard to ballot receipt deadlines is going to apply here. Correct? And that's been the case for 180 years, Your Honor. And I think one feature that I, you know, obviously we're searching for what do the statutes mean at the time, but I think it's very hard for my friends to explain the past 100 years of history and this lawmaking. The Soldier Voting Act in the 1940s was another example where Congress recognized and respected state deadlines. And it just gets very hard to explain those things if you don't adopt the view that the federal Election Day statutes just do not set a ballot receipt deadline. Well, I want to ask you about the recall problem. And before I get to that, throughout your brief, you say that the federal statute does require voters to submit their ballots to election officials on Election Day, must be cast by Election Day, and that the Election Day is the day to conclude and consummate the election through a final selection. You agree with all those statements in your brief? Yes. Okay. But at the same time, you say actually it doesn't have to be submitted to an election official. It just has to be submitted to a common carrier. And there's a contradiction there that I just want you to first address, and then I'll give you my hypothetical. Very good, Your Honor. I think when you put something in the mail, you're not – I think – That's not an election official. FedEx isn't an election official. Right. But the recipient certainly is the person who you're submitting it in the mail to. I mean, that is – Sure, of course. And – right, Your Honor. And I think – You submit it to FedEx, and they deliver it to the election official. But you say it has to be submitted to an election official throughout your brief, but then you say a common carrier is okay. And those two things don't add up. Well, I think the difference is, say, you know, sending it to your brother versus sending it to the registrar. Well, we already dealt with that. The brother turns out to be okay so long as the state says so. I think that's okay on their view, Your Honor. I'm a little more guarded on your view. I think you already answered that one. So here's the hypo. Let's say you have a state where a large portion of the electorate mails in their ballots on or close to election day. Not far-fetched. Many states are like that. Then the day after the election, a story breaks that one of the lead candidates engaged in an inappropriate sexual escapade or perhaps is concluding with a foreign power. Again, not far-fetched, I think. And the competing candidate immediately goes on the airwaves and urges voters to recall their ballots and to tell the common carriers not to deliver them. And many common carriers will do that with anything that you send through them. FedEx, you just call them up and say, I want it back. In that hypothetical, did the election happen on election day? Oh, by the way, it swings the election. So the election did happen on election day, Justice Gorsuch. As we've explained, our ballot does not allow using mail recall, anything like that. When somebody submits their ballot by mail, it's fine. First deal with my hypothetical, and then I'll deal with your statute.  The election happened on election day. Even though it changes the outcome. I mean, I think. Yes, it has to be your answer, doesn't it? I mean, yes, Your Honor. I want to be clear about this. All right. We are not agreeing that the outcome can be properly changed in that circumstance. Well, hold on. It did in my hypothetical. You can't change my hypothetical, counsel. And I'm just saying it's unlawful, Your Honor. What's unlawful? I'm just saying that it's an unlawful circumstance because we don't allow ballot. Oh, in Mississippi. Okay. But that hypothetical could happen in another state, right? I think if the state is not providing that on mailing there's a final choice made, I think that would be a problem with that law under the federal statute. Okay. Now, you say your statute. You're different. You admit my hypothetical could happen. But you say it can't happen in Mississippi because recall is not allowed. I couldn't find that anywhere in Mississippi law. In fact, what I did see was a statute that says that the Secretary of State can promulgate rules and regulations. That's 2315.637.3. And then I went and looked at the regulations. And Rule 2.1 says that an absentee ballot is the final vote of a voter when the ballot is marked accepted. That doesn't preclude recall. In fact, that allows recall. I respectfully don't agree with that, Your Honor. Where does it say recall is not permitted? I couldn't find that anywhere in your statutes or the rule. And I think by providing the ballots are final when cast under our statute. No, it doesn't. It says they're final when marked accepted. That's the regulation, Your Honor. Yeah. It's your regulation. And it allows recall. I respectfully it does not allow recall, Your Honor. Would you read to me the provision that precludes it? It's subsection 3 of the statute that my friends have found. I read you subsection 3 that says the Secretary of State can make rules. And then I read you the rule. To ensure that the ballots are final when cast. The key thing is ballots are final when cast. It says, no, votes promulgated by an absentee ballot, that the person's absentee vote is final. You can make rules about when they're final. And what the rule says is it is final when marked accepted. And that's, I mean, it's speaking to a processing rule about what to do when somebody's, you know, when somebody's ballot potentially doesn't arrive on time, they submit an affidavit ballot. But I would come back to the text of the statute, Your Honor. I mean, final when cast is what our law. Mr. Stewart, I just want to ask a clarifying point to this. Is it possible for a portion of Mississippi's statute to be unlawful, not just go with me here, a portion of Mississippi's statute to be unlawful insofar as it potentially permits recall, but still that, you know, would not address whether Mississippi's statute was unlawful insofar as it allowed ballot receipt after Election Day? Yes, Your Honor. I mean, I think one possibility would be like, hey, look, you need more unambiguous finality here, and you need to foreclose recall period full stop. Okay. And on this question, I just want to make sure I understand what you're saying. When you said, yes, my friends on the other side say it's okay for private parties to deliver just like you do. Are you saying that that's just a manner of receipt? And whether the ballot is received before or after the election, on all sides, everybody agrees that absentee ballots can be turned in by having, you know, the neighbor, the party operative or whatever scoop them up and bring them to the ballot box? Your Honor, I mean, maybe, you know, I'm not sure if I answered the earlier thing as crisply as I could. I'm not comfortable with the neighbor piece. I do have serious concerns about that. But is that tied to the ballot receipt problem, or is that just tied to, hey, maybe this is an unlawful way of executing absentee balloting, regardless of when the ballots make it to the official? I think it's the finality of the choice that has to be done by Election Day. Okay. And my concern is that if you're not sending it by mail or common carrier. You're getting caught up, counsel, again. Could you go back to the question? Justice Barrett is not arguing with you. What she's saying and what you said earlier is, and you believe that under your adversary, the opposing counsel's theory, you can give it to the RNC operative, you can give it to anybody, and so long as it's received on Election Day by the state, that's okay. That's what you're saying, your opposing counsel is saying. And you're saying the only question before us is, if they can designate an appropriate vehicle to transmit the votes, then that's okay. I think I was saying the latter part, yes, Your Honor. But I actually think, under my friend's view, it's okay for, like, a state can deem the ballot received when the party operative himself or herself receives it because all that person has to do is be a ballot receiver designated by the state. Right. And we're trying to cue more closely not just to the text, but also the historical hundred-year long you can submit it by mail. Okay. So, but the bottom line is that states can choose when the final vote has to be counted. States have discretion over counting. Exactly. Thank you, counsel. Justice Thomas, anything further? Just as a point of clarification, without looking at the subsequent history, what do you think the federal law required as far as the election day? That the voters make a final choice by that day. The way I'd boil it down, Justice Thomas, is choice is critical and unchanging. Method of making that choice is malleable, and that does also explain all the subsequent history. And you don't have to formalize that choice? You do by submitting, by parting with your ballot and submitting it to the state. Have we had any examples? Justice Alito? Your position does require some difficult line drawing problems, and maybe that's inevitable. But one is the degree of confidence that one must have in the entity or person who transmits the ballot to the state. We've talked about that. One is how long after the election day votes can be received. A third is whether it has to be postmarked. Aren't there eight states that do not require a postmark for late ballots? There are a number of states that don't require that, Your Honor. I think postmarking is good evidence that something has been timely submitted. That's kind of borne out in the tax context. I think if somebody were challenging a law like that, it would potentially be a very different kind of a challenge. They'd have to make sort of factual showings to challenge that ballots were not cast by election day, but surely not this case. Maybe it's inevitable that some sort of line drawing decisions like these have to be made unless the rule is anything goes, states can do anything they want in this area. We don't have a whole lot to go on here. We have the phrase election day, and we have history. If we looked just at the phrase election day, what would we take from that? I think you've been saying, and we're moving in this direction, we don't have election day anymore. We have election month, or we have election months. I mean, the early voting can start a month before the election. The ballots can be received a month after the election. Well, I think the best way to read it, Your Honor, is that by setting election day, Congress set the final choice day, and that's the key thing, final choice day. What Congress was concerned about at the time was some states making final choices, say, a month before other states were making final choices, and the distortions, the fraud, the risks that that had. And when everybody's making a final choice on the same day, even if some individual choices are made before then, you're honoring the statutes. And I think just later you made this observation, not a lot to go on, because the statutes are just not very – there's not a lot of prolixity there. I think that's a point in favor of deference to the states. You know, if Congress has not spoken to something, especially in this context where states are expressly empowered to regulate these things, that's a big point in favor of letting states continue to do so as they have for a century. Do you think it's legitimate for us to take into account Congress's desire, Congress's passage of the election day statutes for the purpose of combating fraud or the appearance of fraud, and will – and some of the briefs have argued that confidence in election outcomes can be seriously undermined if the apparent outcome of the election on the day after the polls close is radically flipped by the acceptance later of a big stash of ballots that flip the election or – yeah. I think – You've got ballots that are delivered by somebody, by a neighbor, and they're received a month after the election, and they don't have postmarks. I think the best way to do it is to honor the statute's purpose, but doing so by respecting the statute's text and animating context. And what these statutes were getting at was not just any kind of fraud writ large in all elections, which no statute could do, but a situation where, okay, state one votes, has their election on one day and state two neighboring has its election three weeks later because the concern would be, let's say state one goes for one party and then state three goes for the other party with a huge turnout for that other party. You could have potential fraud. People went across state lines and voted, or you could have the appearance of that sort of fraud even if it didn't actually happen. People just said, oh my gosh, they voted for that person. Big turnout. So I think that's the kind of thing that animated those statutes, whereas fraud writ large was not a good example. I do think it's notable that my friends with the United States, obviously they've sounded the anti-fraud theme. They haven't cited a single example of fraud from post-election day ballot receipts. Okay. Thank you. I'll let my colleagues finish. Justice Sotomayor? Has there been any history of voter recall in the mails in necessity? You say the law doesn't permit it, but has there been any history of it? None that I've ever heard of, Your Honor. I mean, this isn't something that was raised until the appellate reply breaks, and nobody cited a single example in history of it. All right. And I understand Justice Alito's questions about the policy questions of what will create discomfort or not, but the Constitution vests the issue of elections in the states, unless superseded by Congress, correct? That's right, Your Honor. So if there is a policy question to be had, the entities to decide that are the states and Congress, not the courts, correct? That's right, Your Honor. And absent a law in federal law that suggests that absentee ballots must be received by a certain time, there's no explicit requirement of that, correct? Right, Your Honor. Or even implicit. And the implicit, we have the military acts that since World War II, at least, and the Civil War, I should go back that far, have permitted absentee ballots to be received long past Election Day, correct? We have a very long history of that, Your Honor. Exactly. So the people who should decide this issue are not the courts, but Congress, correct? Right, Your Honor. The states and Congress. That's right, Your Honor. And as I was mentioning in my colloquy with, I believe, Justice Alito earlier, that's kind of the structure of our system. States go first. If Congress doesn't like it, it overrides. And as I think Justice Scalia said for the court in Arizona Intertribal, we respect what Congress said as far as it went, but no farther. And that's kind of the history of voting and election law in the country. One last question with respect to history. History is informative of what's been permitted by Congress because what we're looking for is what understanding Congress had with respect to elections, correct? That's right, Your Honor. All right. And it doesn't talk about the receipt of absentee ballots after elections at all, so we look to the history of whether Congress has accepted it, correct? I think that does help here, Your Honor. All right. But the attempt by some of the amici here to brutalize this inquiry and say that history tells us how elections must be held and on what date and when receipt can happen or not happen, why is that not an acceptable way to look at this? Well, I think the difference between Bruin and here, Your Honor, is that in Bruin, the question at issue, whether a restriction on firearms is consistent with our historical tradition of firearm regulation, there's a rich history addressing precisely that issue, sometimes through analogy, but very much, I mean, Bruin itself, I believe, I want to say 40 pages of history just analyzing those things. We don't have anything like that, a rich history suggesting Congress was even thinking about locking in election day ballot receipt or anything like it. It was addressing different things. Thank you, counsel. Thank you, Your Honor. Justice Kagan? I guess, Mr. Stewart, your answers to Justice Sotomayor's questions leave me unsure about what you think about these appeals to history. I mean, you've said that there's not a lot of text here. I agree with that. I think that the way this case has been argued all around suggests that that's so. So then we're left with history, or are we left with history? You seem to appeal to history sometimes, Justice Barrett said this, but then repudiate the appeals to history at other times, and I guess I want to know what we're supposed to be doing when we're looking at this statute and deciding this question with respect to all this historical evidence, scant or not scant as it may be. Sure, Your Honor. So I think the best way I can break it down is this, is that history is informative here, and the way it's most informative is that since Congress set, I mean, throughout our history, and certainly since Congress set the federal election day, election administration in our country has been very, very dynamic. As I tried to highlight in my opener, it was one thing in person, on the spot qualification checks by fellow voters, ballots were naturally received on election day, all those features. As soon as Congress had a reason to alter the methods by which a choice was made, it did so, but the one constant is that the voters, in a popular government it's most critically the voters, the constant is that the voters make a final choice of officers by election day. So I think history shows that election administration is dynamic. States have wide leeway. They just have to make sure that the voters make a choice by election day. Thank you. Thank you, Your Honor. Justice Gorsuch. Almost done, Mr. Stewart. You emphasized to Justice Kagan and many others that the final choice, at least, has to be done on election day, and so recall would be a problem for you if it could happen, but you say that that doesn't happen in Mississippi. That's your position, right? Right, it's not permitted. If recall could happen, that would be a problem for your position. I think there potentially – Because then it wouldn't be a final decision on election day, right? That's right, Your Honor. I think there would still be a factual question. I still have not been cited anything to say that recall is actually a thing that can happen in the world. I understand, but if it could happen, that would be a problem for your theory because the final choice wouldn't have happened on election day, right? Fair, yeah. Okay. So you say Mississippi prohibits it. We've been through whether that's the case or not. Very good. But let's say it did. Let's say there was a law prohibiting recall. How would it ever be enforced? Because how is a state to know, and how is even a common carrier carrying an envelope, to know whether that is a ballot that needs to be recalled, and who are you going to prosecute? Well, I think it could be enforced similar to other voter things. I mean, in our state, there are notarization and affidavit requirements in signing things. Because I think if it were critical for the voter to say that there will be no recall, the voter could say, I hereby commit that I will not attempt to or recall this package in any way, shape, or form. They could just add that, sign it. I take the point about proof problems, but, I mean, gosh, Justice Gorsuch, I mean, violating state election laws in a state that really is anti-fraud and really takes wide measures to enforce its laws, that would be quite a thing for a voter to do. Well, in my hypothetical, which, you know, you say is unlikely, to swing an election and all that on recall, but if history teaches anything, scant or not scant, it's that as soon as something's allowed, it will happen eventually, right? And, you know, so somebody, my hypothetical happens, and everybody recalls their ballots. I'm just not sure what recourse the state would have against people who violated its anti-recall laws. I mean, if people are, say, recalling things for a common carrier, there's going to be some record that they recalled those things. How's the state ever going to find out about it? I mean, I think the same way as one... You're going to go prosecute individuals? I mean, Your Honor, I'd say if somebody is lying in an affidavit that they're not going to recall something, I mean, if people are doing that with impunity, we have quite a problem, but it is a problem that the state can address and enforce. I just don't know how they'd ever find out about it. I mean, I think, obviously, you know, some crimes are harder to find out and prosecute than others, Your Honor, but I think it's still, I mean, people can do things, try to, like, tamper with ballots, all that sort of thing. I think it's just still a matter of respecting the statute. Thank you. Thank you, Justice. Justice Kavanaugh? When did Mississippi switch to this method? 2020. In 2024, added common carriers. And why? It was first because of the pandemic. I have, I don't know that there's necessarily an answerable why as to the 2024 one in a clear way. And the other side makes a point when we're looking at history, to the extent historical practice is relevant, that it only became widespread to allow it to be mailed by Election Day in more recent years, and that the predominant approach was to require receipt by Election Day throughout the historical practice you cite until very recently. How are we supposed to think about that? I mean, I think it's the same way to think about, I think, the broader history of election laws. When states have kind of seen a problem, they've adapted and adjusted, often in the direction of making sure that more votes can be counted. I mean, that was obviously a big thing when absentee voting started to become a prominent thing. Certainly, we care much about our history of people showing up in person, but we realized that was very difficult for people away from home and that we wanted to kind of widen the tent and make it so that people could vote. And I think perhaps another realization, even though we've had UOCAVA for 40 years, Justice Kavanaugh, is that for military voters in particular, this is a perennial challenge about making sure that they can actually get their ballots in on time. I mean, that's perhaps why UOCAVA voters in particular are a very popular group for post-election day ballot receipts. Would you say that the states that require receipts by election day are disenfranchising voters? No, they're not, Your Honor. I mean, a reasonable ballot deadline does not do that. I would asterisk just there are the practical barriers for those overseas military voters. But for the citizens who are not within that class, you would not use the term disenfranchisement to say it has to be received by election day, November 3rd, rather than, I guess it would be five business days, November 10th. You would not use that term to describe that, correct? I would not, Your Honor. And then picking up on Justice Alito's questions, Professor Pildes and others have said that late-arriving ballots open up a risk of what might destabilize the election results if the apparent winner the morning after the election ends up losing due to late-arriving ballots, charges of a rigged election could explode. The longer after election day any significant changes in vote totals take place, the greater the risk that the losing side will cry that the election has been stolen." And my question is, my questions, one, is that a real concern? Two, does that factor into how we think about how to resolve the scant text and the maybe conflicting or evolving history here? I think, I certainly respect the perception. I think one thing notable in this case, and I think helpful, is that there has not been much of a showing about actual fraud from post-election day ballot receipt itself. I mean, I think that would... Well, I think Justice Alito referred to, and I think this quote refers to the appearance of fraud. And is that a real concern? Is that something we should be thinking about? Confidence in the election process. Just curious how we factor that in here. Right, and I think if we go back to the same answer I had for Justice Alito about scant, you know, simple text, straightforward text, and respecting the limits of that text, and looking at the animated history, I think it really was, it was the double-voting fraud concern. I don't know that people have that particular concern. I think, you know, obviously people can be, you know, a result flips. I think Congress may be able to take measures to address that, but I think there's no good evidence that Congress was doing that beyond presenting double-voting in this context. If you have to have a deadline, which you acknowledged, and having a deadline of November 3rd rather than November 10th doesn't, for receipt, doesn't disenfranchise anyone, why wouldn't it make more sense to take account, in some respect, of that concern as we think about how the text and history put together? Well, I think, I mean, something that Congress is clearly, I think, trying to do was adopting a simple rule in this text, and I think a very simple rule is everybody must cast their ballot by election day. I mean, that's quite administrable. I mean, if you have an election day ballot receipt deadline, there are certainly things to commend that. I think you're alluding to some of those, Justice Kavanaugh, but there's also a question of when do I vote? You know, I'm not sure, you know, do I need to do it at 7, you know, whatever it is, whereas, you know, if somebody wants to get all the information possible, they like voting on election day, you have a pretty nice, clear, simple rule, and that seems to dovetail quite well. Well, the simple rule, but if it arrives on November 11th, you're out. Right, but I think that's kind of baked into the risks you always get when you're doing, there are always some risks, you know, regrettably with mail-in voting. You can eliminate some of those risks by voting in person, but... The risks would seem the same no matter whether it's November 3rd or November 10th, in other words, that it could take longer than a week for the mail to get there. The risk is there, but I think if you have election day ballot receipts, and I think what we're addressing, I think, are more, the way I might frame the issues are these are policy points. The question is, did Congress wall off states from debating these policy points? I think the answer is no, and I think states could very reasonably say, you know, look, we do want to get counting and get a result very fast, but we are concerned about these military voters. We do want voters to be able to get whatever information they want. I mean, the weekend before, you know, that used to be a big deal in elections at least. Maybe it still could be in the future, and I think a state could say, hey, look, federal law didn't wall us off from doing this. We get that it has some things about it that other states might weigh differently, but we want to allow that for our voters. Well, I take your point, but it really goes to just thinking about what election day or day of election means, but I take your point. Thank you. Thank you, Your Honor. Justice Barrett? So I want to be clear about what your definition of finality requires. Would it require finality if the vote arrives by election day as well? So let's imagine an absentee ballot that's put in the mail or sent by common carrier well in advance of election day and is received and put in the ballot box by election day. Does that one have to be final? Or in other words, would it be a problem for you that the U.S. Postal Service permits recall for those ballots that are sent in advance? I guess what I'm asking is, do you have the same problem either way? You've taken a lot of questions, and I have those questions, about what the effect of this recallability is. I guess my question is, I want to understand what your definition of finality is and whether it applies to the earlier absentee ballots as well. Did they have to be final such that it would be illegal to recall them pursuant to whatever regulation the post office has? Right. I think I got it, Justice Barrett. Let me see if I can do my best on it. I mean, I think, in theory, if election day has not passed, there could be a window for somebody to... So it would be okay. It wouldn't be illegal for somebody to recall a ballot before election day. I guess I don't understand why. I mean, if the state allowed that, Your Honor, we don't allow it. So it would be okay for the state. I know you don't allow it. Right. But I guess I'm struggling because if your definition of the election or the vote or casting the vote requires finality, I'm trying to understand why that would be different before the election. And when I'm saying before the election, I'm talking about receipt for earlier sent absentee ballots and for later sent. It seems like the same rule should apply regardless. But it seems like you're saying something different. Yeah. I guess I'm having a hard time conceiving kind of a dual-track rule in that circumstance. So would it be, let me try to put it this way, would it be illegal for a state to permit absentee voting but permit recall or just kind of be silent about this Postal Service regulation that permits recall or anything a common carrier did to permit recall? Recall is recall a problem even if it's a possibility for those earlier absentee ballots. Because you can't consider them final. All these questions that you've been taking are about whether you could really consider the ballot to be final if you could recall it. So I'm asking whether that same finality test applies for the earlier ballots. And I'm not sure, Your Honor. I mean, I think, I guess I just keep coming back to you can't recall or change your vote or make it. And that's true no matter when you send it. I think, I mean, certainly in our state. And I think that's right, Your Honor. But I mean, as a matter of the federal law, it just seems to me that your definition has to be consistent. And it sounds like you're changing it for the earlier absentee ballots and saying finality has some kind of different meaning. Right. Well, I think a state has to do whatever it would need to do to guarantee that on Election Day, all ballots, every cast vote is final and cannot be recalled. But it doesn't have to be final at the time it's sent. It's okay to recall it. If you send it two weeks in advance and you change your mind, that's not a problem. Okay, I withdraw. I guess I'm having trouble seeing how the federal Election Day statute itself would necessarily work. Well, it's about your definition of election. It's about your definition of what it means to cast a vote. But let's put that aside. Obviously, there's a lot of talk about history in this case. Well, the Electoral Count Reform Act was passed in 2022. And for the first time, it defined Election Day. Should that matter? So should we be looking at how Congress understood Election Day to mean in the period of voting what it thought in 2022? Or should we be looking at the late 19th century and the Civil War practices? I think most vitally, it still remains 1845 as the key date, especially given that we have statutes that are trying to manifestly achieve uniformity in what is required of all federal offices. So I do think 1845 is the key date. So Congress carried over in 2022 the same understanding of Election Day that had persisted throughout? I think that's right. Final choice of an officer. Thank you. Thank you, Your Honor. Justice Jackson? Let me just clarify. This case is not about a Mississippi practice or policy related to recalling ballots. Is that right? That's right, Your Honor. So I guess I'm a little confused about those kinds of policy questions. And I guess I think that the Constitution's allocation of responsibility here actually makes this case about who decides. I mean, there are a lot of policy questions. Justice Alito ran through several of them. Who gets to receive the ballot? How long after can they be submitted? Does it have to be postmarked? I suppose we can add, is recall allowed, et cetera, et cetera. But the question, I think, is whether Congress has precluded the states from making those calls, drawing those lines. And your position, as I understand it, is no. That's correct, Your Honor. That the scantness of Election Day in the federal statutes actually is a point in your favor because it indicates that Congress was leaving it to the states to draw the various lines that might arise in this circumstance. Is that right? That's right, Your Honor. And that's reinforced, for example, by the 1866 statute, which shows that when Congress wanted to be really prescriptive in this area, it was very prescriptive. It described this is what the states have to do and so forth. So if we were focused, really focused, on what we're asked to answer here, which is are the states preempted by federal law from having post-Election Day ballot deadlines, you would say no. No, Congress just didn't decide that. Let me ask you about the history with respect to Bruin. I guess I'm not sure I understood your answer to Justice Sotomayor because it seems to me that Bruin is not even the right methodology by which to be thinking about this. Bruin applied to the Second Amendment because the Second Amendment incorporated a preexisting right. And the point of the history and tradition test was to try to evaluate the contours of that right. We don't have that dynamic here. We're trying, I thought, to figure out what Congress meant when it included Election Day in its federal statutes. So it seems odd to me that the suggestion that the limitation on our understanding of Congress's intent is somehow tied to the states' practices. I think that's right, Your Honor. I think the other thing, I think the point I'd emphasize is that the idea of embodying a preexisting right confirms that there's something very much unchanging. And the thing that we know about election administration, it has very much been changing throughout the course of our country. It's been changing throughout the course in a way that undermines the notion that there was one consistent practice, first of all, or that Congress's law, the meaning of Election Day in the federal statutes, somehow was tied to what the states' practices were about that. I mean, I think this is your original point, that there were lots of different practices. And so to the extent we're saying, oh, you could only look at Election Day in the federal statute to mean exactly what the states were doing back at that time, this imperils a lot of different things, not just post-Election Day ballot deadlines, right? That's right, Your Honor. And the only way to explain all of these changes is to read them in line with plain text in the limits of history, which is to say election is a final choice. I mean, otherwise you have to do what my friends have to do, which is, hey, look, we're going to pick out the one practice from these 19th century codes that we like, ballot receipts, say that's what an election is, and just ignore in-person voting, qualification check on the spot by fellow voters. And that's just not sound history. Can I ask you one final thing about the amicus brief from the Society for the Rule of Law Institute? Because I found it very interesting, and I didn't really know what your view of it was. That amicus brief focused on the Electoral College, and Congress is setting it up, you know, back in 1787 with the understanding that the casting of votes can happen on a particular day, and the receipt of those votes by election officials can happen on a different day. And, in fact, the way the Electoral College is set up, I think at the time Congress permitted in 1792 about a month to elapse between the casting of votes, which, by the way, it called Election Day, and the receipt of the votes by the electors submitted then to the President of the Senate up to a month after. So I think that's, to the extent we're worried or thinking about historical evidence, that seems to me to be pretty significant and compelling historical evidence of Congress's understanding of what was required by Election Day versus the receipt of those ballots at some subsequent point. Correct? Yeah, I think that's well stated, Your Honor. The other thing I'd tie it to in the same amicus brief, and I think the brief, the amicus brief does a nice job of tying into this, is the key thing is choice, choosing. The Constitution refers to choosing, choice, those kind of verbs, and that's why that sort of thing is allowed. And the choice is made when you cast your vote under the electoral process system when the electors cast their vote. Right? Right. And that is distinguished. I'm just trying to make clear that the casting of the vote and the receiving of the votes historically have been conceived of as two different things that can actually happen at different times. Right? I think so, Your Honor. Thank you. Thank you, Your Honor. Thank you, Counsel. Mr. Clement? Mr. Chief Justice, and may it please the Court, all agree that elections for federal office have to end on the day of the election specified by Congress. And all agree that you can't have an election unless you receive ballots, and there must be some deadline for ballot receipt. Nonetheless, Mississippi insists that ballots can trickle in days or even weeks after Election Day. That position is wrong as a matter of text, precedent, history, and common sense. Mississippi all but concedes that the original public meaning of election included both offering to vote and the receipt of that vote or ballot by election officials. And, of course, the key distinction between voting and an election is that an election involves the combined action of voters and election officials, as this Court underscored in its decision against Foster against Love. And, of course, Mississippi insists that at the time these statutes were passed, ballot receipt and the casting of the ballot were so inextricably intertwined, no one would have thought of one without the other. That seems to me to be a damning admission, but it also ignores the advent of field and proxy voting in the Civil War and the enormous efforts that states went to to ensure that all of the ballots, whether by proxy or by field vote, were received by Election Day. In the state's view, all of those Herculean efforts were for naught or were entirely gratuitous. Now, the state's position actually works even worse as a matter of common sense. If somebody in Gulfport the day after the election asks, is the election over? The common sense answer is, no, it's not. The ballots are still coming in. And if somebody asks, who won? The truthful answer is, we don't know yet. The ballots are still coming in, and they may trickle in for weeks or months. And, in fact, they may trickle in for weeks or months, with or without a postmark, in differing ways in differing states. That reality gives the lie to the idea that we have a uniform National Election Day. I welcome the Court's questions. How would you define the day of election? I would say that the day of the election is the last day in which all the ballots are passed and they are received into official custody. So, how would you treat early voting as compared to late reception of votes? So, I would say, I mean, you know, I think the best place to look for a treatment of early voting is the Chrysling decision by Judge Kleinfeld in the Ninth Circuit. Because after Foster v. Love, there was a suggestion in Foster v. Love that maybe early voting is a problem. He rejected that claim based on two things. One is the distinct history of early voting. And the second is the idea that was explicit in this Court's decision in Foster v. Love that Election Day is the date of consummation. So, I would say, under our theory, early voting is permissible, largely because it has a different history, and because of this idea that the Election Day is the date where the election is consummated. Would you spend a few more minutes on, or at least a little bit more time, on the voting during Civil War? There was some suggestion that that's an example of late reception of votes. And I think in your intro was my thinking that it was not that proxy voting was a way to make sure that the vote occurred on Election Day as opposed to afterwards. Well, not surprisingly, Justice Thomas, you were exactly right. So, proxy voting is the thing that happened in the Civil War that is most analogous to absentee voting. And the thing that is most striking is I think five states had proxy voting. Every one of those five states required the votes, the ballots, to be received by election officials back home by Election Day. Now, that's an incredibly inconvenient thing that was done in the Civil War to ensure the ballots were received by Election Day. And under the state's view, they didn't need to do that. Now, it's really no different in the context of field voting, because there were maybe a dozen states, if you're not going to count the Confederate states, there were about a dozen states that did field voting. Again, every one of those ensured that the ballots were received into official custody by Election Day. And, of course, most of the states went to enormous efforts to replicate the machinery of the ballot box and everything else in the field, and some variation in that. But the one thing that didn't vary at all was the ballots had to be received into official custody by Election Day. And just one last thought on this Civil War practice. My friend's only real answer to the idea that at 1845 there was an understanding that everybody would have had, that, of course, the election involves both the offer to vote and receiving the vote, the ballot, into official custody. His only answer to that is, well, the issue hadn't ripened, that nobody even thought that you could divide the two. But the issue ripened in the Civil War, and the issue ripened in such a way that every state required the ballot to be received into official custody by Election Day, and then that certainly informs what Congress is thinking in 1872 when they extend the presidential Election Day deadline to the congressional race. Mr. Clement, what do I do with the two states during the Civil War? One of the states, Nevada, wrote out, Nevada, you say five favor you, at least two don't. Nevada simply designated three of the highest officers in command, didn't swear them in, just said three officers in the command can create a ballot box or suitable receptacle for votes, and collect the votes of the soldiers with little further formality. Those military officers then would mail those ballots in, and they would be counted whether they arrived on Election Day or after. What do we do with Rhode Island that simply directed soldiers to deliver a written or printed ballot with the name of the person voted for to the officer commanding the regiment to which he belonged? That officer wasn't sworn in as a state official either, and receipt could happen thereafter. So it's not, yes, many states believed, as they did at the time, that voting had to be in person, that voting had to be by voice instead of by paper. Lots of states had lots of beliefs about what a proper election should look like, but how do we deal with the outliers? Or do you just want to ignore them? No, I don't want to ignore the outliers. I actually think Rhode Island and Nevada helped me in my side of this case, and I think that's because they did designate somebody, they might not have given them an oath, but they designated somebody as an official to receive the votes. So they're here, what's the difference between the post office and a common carrier? It's the official. You want an individual person, is that it? Well, I want somebody who's cloaked with government authority, so that's one difference, but there's a critical second difference. But it's not state authority, meaning you're now expanding what you're saying as government authority. So what I would say is it was government authority, and I would say that my understanding of the history is that all those federal officers voluntarily accepted the responsibility, whether they took an oath or not. So could a neighbor, and so could anybody else. I'm not moved. The point is that it permitted someone else to deliver the item, a final cast vote to deliver it and be received after. Under your theory of this case, and I think you and the government disagree on this, you believe that absentee voting by the military and overseas voters, the various laws, that federal laws under which states have proceeded with respect to those votes are illegal? Or they're not saying what everybody has understood them to say, that states can accept absentee ballots after the election? Military and overseas ballots? I don't think any vote is unlawful. Let me try to address how I think you would reconcile UOCAVA with the Election Day statutes. And to start, I think it's important to recognize that UOCAVA is not limited to the federal general election. So UOCAVA applies to primary elections, to runoff elections and special elections, and federal general elections. The Election Day statutes only apply to the general federal election. So the way I would reconcile the two is to say that all the references in UOCAVA to state deadlines are perfectly fine, not preempted at all, not displaced at all, not even anomalous with respect to the primaries, the runoffs and special elections. Then the court has a job to do in the federal general election as to say, like, kind of which is the specific, which is the general. I think the more logical way to do it would be to say that with the understanding in this court, if you decide in our favor, that for the federal general election, the ballots have to be in by Election Day. Maybe we should have another president now, because wasn't it in Florida that they were counting military votes after receipt? So with all due respect, that is the reddest of red herrings, because what happened in the 2000 election in Florida is that pursuant to a consent decree that was entered by a federal court, because Florida was violating the principal provision of UOCAVA, which says you have to give the absentee ballots to the overseas voters 45 days in advance, because Florida was violating that, there had to be a consent decree to create a remedy that was not provided. Here what happens was that the judge made up the deadline, not the state. But how do you deal with the Soldier Voting Act in 1942 that permitted ballots for the extension of absentee ballots? So the 1942 Act, at least as I understand it, again, is not addressed solely to general elections. And then with respect to general elections, it says that the military special SVA or whatever it was, the special military ballot had to come in by the time the polls closed on Election Day. So I actually think the 1942 Act is fully supportive of our position here. So the DOJ has been acting illegally when it has sued states for not following the act, the UOCAVA? No, again, remember that the UOCAVA's principal protection is the provision, this is in 302 of the Act, not 303 and 304, but the 302 Act provision that says that you have to get the ballots to overseas voters 45 days in advance of the election. And interestingly, in the single most important provision in UOCAVA, it ties the deadline to the date of the election. So what do we do with Congress saying process in the manner provided by law for absentee ballots in the states involved, that's UOCAVA, and that at the time the hearings were being held on it, 12 states were identified as counting absentee ballots after Election Day. So it just ignored it and decided it was going to exempt out a little part of it, but not everything. With respect, Justice Sotomayor, that's why you have to remember that UOCAVA is not focused only on the federal general election, which is the only thing where Congress has specified a federal deadline. But does that help you or hurt you, the fact that it is broader? I mean, it's broader in the way that you describe. It applies to all of these different elections, but it doesn't make the distinction that you are making. It says with respect to all of them, state absentee ballot deadlines should apply. You're encouraging us to treat the general election differently because you interpret Election Day with respect to the general election statute to have a defined time as of Election Day, but that is not what this statute appears to be doing. So I think it helps us, and I think it helps us because to the extent you're concerned with those references to state election deadlines, they're inevitable. If Congress is going to address anything other than the general federal election, it has to refer to the state deadlines for receiving ballots because there are no federal deadlines for any election other than the federal general election. If that's true, Mr. Clement, you would think that Congress would say, you know, with respect to the deadlines that there's no separate federal requirement, X rule, and with respect to the deadlines that there is a federal requirement, Y rule. But it doesn't do anything like that. It treats them all of a piece. And we know that for many of these elections, states were setting their own deadlines, and Congress in passing these statutes didn't suggest any kind of distinction between those elections and these elections. So Justice Kagan, as with almost every statutory question that comes to this court, Congress could have made it easier. They could have done all that. And they didn't, and I think you just have to correct me. So what do we take from that? I mean, it seems what they took from that is that they thought that this state function of setting ballot receipt deadlines was something that was a state function, and that's what they took from it. And so they wrote the statutes this way, where with respect to all elections, the states were setting their own receipt deadlines. So I don't see that in the text. That doesn't seem even logical to me. I wouldn't think the one place we were going to especially defer to the states with respect to the federal general election deadline is with overseas and military voters, where the interests of the federal government are probably paramount. But I just want to be clear about this. If you read the statutes different and want to reconcile them the way that the SG does, we have no objection to that. We just think the better way to read these two statutes is to reconcile them than the way that we do. And that would have one benefit, which is don't forget that in at least 20 states, they take the election day ballot receipt deadline seriously. So if you simply say in this case that that election day ballot receipt deadline is true of all 50 states, then every overseas voter, every military voter, is going to be treated the same. And they'll still have 45 days to get their ballot in. And one other thing just about Mississippi in particular, Mississippi has provisions in its election code that specifically accommodate overseas military voters and overseas voters. And it's not the ballot extension deadline that we have challenged here. There is a specific provision that says for UOCAVA voters and UOCAVA voters only, they can e-mail their ballots in. So the idea that anybody is going to be disenfranchised here when the overseas voters and only the overseas voters have the option of e-mailing in the absentee ballot that they get from Mississippi seems to me to completely be misplaced. And the concern should really be the heartland cases. And remember, as Justice Alito alluded to, you have eight states that don't even require a postmark. And there is nothing in Mississippi's theory that turns on the existence or the nonexistence of a postmark. And that's probably a good thing because the post service has made clear that they don't even postmark all of the mail. And postmarks have their own problems. I mean, the main mailbox, post box in post office rather, in Chicago, stays open 24-7. So when all the other polls close in Illinois or every other state at 8 p.m., the post office is still open until midnight. Now, I'm not here to say that there could ever be voting fraud in Chicago. But the possibility that there's a four-hour window where people could go get their absentee ballots postmarked after all of the returns are in, and they know that, oh, this is the election where these things could turn the result, that does not seem entirely fair. Can I ask you a question about the offer to vote and the vote? So historically, it seems like the offer to vote was then you had to adjudicate the voter's qualifications. And then if the qualifications were met, then the official received the vote, and then it was put into the ballot box. And as I understand it, Mississippi still has sort of a similar system because they have to adjudicate voter qualifications as well as accept the vote. So you sometimes say, you in the United States, when the ballot box closes and you sometimes say receipt. Are those two different things? And do the voter's qualifications have to be adjudicated by Election Day as well? I don't think they're exactly the same thing. I mean, in some sense, I think the ballot box closing is a nice kind of common sense capture for the idea that the election ends on Election Day. Now, I think with respect to the voter, the qualifications challenge, rather, most of that is solved in the current system by registration requirements, which they didn't have historically. So we think the critical thing is there are two things that have always been absolutely indispensable in elections, and that's the casting, but also the receipt into official custody. And one thing I want to make clear about this is Mississippi still takes receipt into official custody very seriously, and it is indispensable. They just have a different deadline. They have a five-day deadline. And we've had a lot of discussion about the possibility of recall, and I think that is a problem for Mississippi. But they have an even bigger problem in my mind, which is the November 11th problem, which is to say, as Justice Kavanaugh pointed out, if the ballot arrives six business days late, Mississippi doesn't count it. It's a nullity, and under the state statute, they destroy it. But let me return you to the adjudication question, because that's really, you know, the Mississippi local officials brief says that they do not adjudicate the qualifications of all ballots received, even by Election Day, because it takes them more time to compare the signatures and process them. And I'll just get cut to the chase. The heart of my concern is that historically it seems like both of those things happened on Election Day, whether we're talking about Civil War, voting on the field, et cetera. But I understand that under your theory, we can separate those and say that only receipt matters, but adjudication can, in fact, happen afterwards. Is that correct? I mean, that's the position we're taking in this case. I mean, I haven't, you know, I've spent enough time studying the Civil War history on ballot receipt, so I haven't studied everything about that election qualification. My first cut answer standing here is that can be understood as part of the canvassing process, and that can take place after. But I guess why can you separate out if historically those two went hand in hand, that the qualifications, there was the offer to the vote and vote. It seems odd to say that the election is concluded by receipt when historically both of those things happened at the same time. So why is that one piece of history plucked out? So two things. One, maybe I have another challenge that I haven't thought of, so I don't want to like utterly foreclose that. But the reason I'm focused on ballot receipt is, A, it's what's directly at issue here, but also, B, it's the thing that to this day every state considers indispensable. No state, Washington is the one that lets 21 days go by, but no state says that you don't have to have a ballot receipt deadline at all. And under Mississippi law, it's not, despite what they want to tell you, the ballot is not final when it's submitted. The ballot is final when it's received by election officials within five days. And you can have all the certifications that this was before election day, and I have it notarized, and if it comes in on the sixth business day, this is the November 11th problem. What the state does is they treat it as a nullity, and under the state statute they direct it to be destroyed. So the ballot doesn't become final just when it's submitted. The ballot becomes final when it is submitted, and under Mississippi law, it is received into official custody by the registrar within five business days. That's finality under Mississippi law, and our humble submission is finality should take place on election day. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? We have lots of phrases that involve two words, the last of which, the second of which is day. Labor Day, Memorial Day, George Washington's birthday, Independence Day, birthday, and Election Day. And they're all particular days. So if we start with that, if I have nothing more to look at than the phrase election day, I think this is the day in which everything is going to take place, or almost everything. And then we have three points in time, 1844, 1872, 1914, and we can ask what would people have thought on those days is meant by this phrase election day. Which of those should we choose? Which of those dates should we choose? Well, I think you could choose any of the three. I mean, honestly, I think the single best one, if you're just going to choose one, is 1872. And the reason I say that is because 1914 is the latest in time, but that's the one that Congress gave the least thought to because it was right after the 17th Amendment. They just said, yeah, whatever the rule is for the House of Representatives, we'll use that for the Senate. Okay, so in 1872, someone sees election day, and maybe they start with the idea, okay, a particular day, and then they say, but I remember the Civil War. And a big exception was made. There were different practices in the Civil War. It wasn't everybody going to a particular polling place and voting. So what then can we take from that? Should we just take from that, well, this was an incredible national emergency where extraordinary measures had to be taken. What should we take from that? What would an ordinary person have thought election day meant in 1872? I think they would have said that's the day by which, at a bare minimum, the ballots have to be cast and received into official custody. And I think they would have, to the extent they were thinking about the Civil War history, I think the thing that would have impressed them is that even at a time of great national emergency, every one of the states insisted that the ballots be received into official custody by election day, whether by proxy or by field voting. Nobody said, well, you know, it's a Civil War. Let's give them a month. Nobody said that. And people literally went into harm's way in order to do field voting, and they all did it by election day. That seems to me to powerfully reinforce the idea that in 1872, if you told anybody, hey, all this means is you've got to cast your ballot, but the state can receive it for up to 21 days later, with or without a postmark, I think they would have thought that you were talking about a different country. Let's take the last of the days, 1914. My understanding is that Maryland departed from your position a couple of years after that. Did anybody say at that time, wow, Maryland is violating the election-based statute? I mean, I don't know that they did in 1918. I don't know all the details of that. I think actually the first couple of these statutes that my friends try to count really are something different, which is they really allowed you to sort of vote in one district by election day and then have that election official give it to another election official. So I don't think some of those count. What I would say, though, is in 1944, Montana passed an extraordinary law that tried to extend the ballot deadlines for ballot receipt, and they did it in World War II, and they did it for the best of intentions. And in the Maddox case, which the parties cite in the briefs, it's this kind of extraordinary case where the Republican Party and the Democratic Party of Montana both joined forces to go to the Montana Supreme Court and said, is this law lawful? And the Montana Supreme Court said it's not lawful, it violates state law, but they also said it violates the federal law specifying election day. Thank you. Justice Sotomayor? But the rule of decision was based on state law in Maddox, wasn't it? I disagree. I mean, you can all read it for yourself. I mean, I know my friends on the other side say that. I've read the case like seven times. In D.C., I vote by going to a ballot box that's on the city streets, all over the city streets. Is that receipt by a state official? I just go to the ballot box. It's locked. I don't know and don't remember if it's time stamped or not, but the city, I don't even know if it picks it up before election day. It certainly picks it up at some point. Is that legal under your theory? I think that's compliant with the federal election. Why? There's no state official who has received it. A ballot box has received it. It's official state custody. And I think it's important to remember that when ballots come into official state custody, and this is true under Mississippi law as well, at that point the state treats it very seriously and establishes a chain of custody. I mean, if you want to look in the petition appendix at the Mississippi statute, the provision that we're It's different for you in kinds because a military officer like Rhode Island and Nevada during the Civil War, even though they were federal officers, not sworn in in the state, they were official enough. Is that it? An empty ballot box with no person next to it is official enough? But the Postal Service is not. The Postal Service is not. I don't know all the details about what Nevada and Rhode Island did. I'm actually not even sure the Nevada statute was ever implicated because Nevada didn't become a state until the Civil War was basically over. But in all events, I think the statute that issues here is worth reading. If you look at 89A of the petition appendix, they go to Mississippi once it's in the ballot box. And this is true of the absentee ballots that are received within five days. They go into lockdown. The registrar is told to record the number of ballots in the box at the end of every day. They are specifically treated, essentially, as to have a chain of custody to ensure that if somebody alleges there was monkey business in this election, they have a clear record of chain of custody that can show no, there was not. There's nothing like that when you drop it in the mailbox. There's nothing like that when you use FedEx. They say it's illegal to recall your ballot, but the Postal Office allows you to do that. The FedEx allows you to do that, as Justice Gorsuch indicated. I don't think there's any way the state would even know it happened. We have a state government official lawyer telling us on behalf of the state how to read their laws. Where are we, on an issue that was forfeited below and not raised below, are going to assume to the contrary now? It was raised below. This was raised in the reply brief in the Court of Appeals. When my friend referred to it not being raised until the reply brief, I assumed he was referring to in the Fifth Circuit. But it's in the Fifth Circuit decision, so it's properly before this court. Justice Kagan? Mr. Clement, I'm wondering what you make of the 2022 amendment, because that pretty clearly suggests that voting can take place not just on a day, but in a period. And what are we to make of the fact that Congress just a few years ago said there's a period of voting, and we're fine with that? To me, the most striking thing, if we're talking about the same statute, the Electoral Count Reform Act or whatever it is, to me the most striking thing is there's one change to the federal Election Day statute in particular, and it creates a possible exception for force majeure events. And I would view that as the only exception that Congress created. But the exception for force majeure events assumes a baseline of a period of voting. It talks about a state modifying the period of voting for those special events. But the baseline is that the state has a period of voting, which it then modifies for force majeure events. So I think that this is not like some special exception. It's an exception in the statute that assumes that a state is going to have not a day of voting, but very likely a period of voting. So I would think that the most the period of voting would refer to is the practice of early voting, which we're not taking issue with here. And as I said, that has a distinct history. But I don't think they were saying the period of voting could last until after the election, because if that's what they had in mind, there would be no reason to create an exception for force majeure events. It would just be part of the period. And could you tell me, going back to this we're not taking issue with early voting, how it is that you're not taking issue with early voting? Because every time I sort of try to state what your rule is, it seems to me it's a rule that prevents early voting, because you're basically saying there are two things that have to happen, and they have to happen on election day. And it's the voting and, you know, the casting of the vote and the receipt of the vote, and both of those things have to be on election day. And just like a normal person says, okay, well, when I early vote, I'm not doing that on that first Tuesday. So I get why an ordinary person would think that, and for what it's worth, like a couple of ordinary people read your foster against love decision and thought, whoa, this gets rid of early voting. And they brought challenges in the Ninth Circuit, and they brought challenges in the Sixth Circuit, and all those challenges were rejected. Let me suggest to you that they were rejected because it just seems inconceivable that on the basis of this kind of evidence, we would reject these practices that are so entrenched in 30 states. But the problem still remains is that your theory would have us reject them. No, I don't think it would. And, I mean, you know, it's my theory, so I'll tell you what it is. These things have to be consummated by election day. I'm not making that word up. That's not the word I would make up if I were making up words. But it's the word that this court used in foster against love. So that's where the theory comes from? It comes from the word that this court used in foster? Yes. Don't look so, you know, because a word that we used in foster is the premise for your being able to separate Mississippi's law from every early voting law in the world, even though your basic theory should say that the early voting laws are also verboten? No, with respect, I mean, I said two things when I first answered this question. The differential history. And, you know, I think it's worth reading Judge Kleinfeld's opinion on this. It's a key swing case in the Ninth Circuit because he goes through this in quite some detail, and he admits there's actually a pretty good argument based on the text and foster that early voting is problematic. But he nonetheless, even though he thinks it's a pretty good argument, comes to the conclusion, not because he thought it was crazy, but because the history is different, which was marshaled in that case in particular, and foster talks about everything needing to be consummated by Election Day. And I don't think it was just a random word. It's trying to explain the unanimous decision in foster against love, which says, you know, there was voting and there was receipt of ballots, and the problem was it all happened a month too early. Thank you. Justice Gorsuch? On early voting, I just want to see if I've got it right. Both sides agree that there needs to be a final decision by the voter and receipt by Election Day. Correct? Well, I don't think so. I don't think they agree with receipt by Election Day. Receipt by somebody. Okay. I'm going to do that. The reason I trip up on that. I know, but just wait. Okay, sorry. I'm just trying to make sure I understand. There needs to be some final decision by the voter and receipt by somebody by Election Day. On that, I think you two agree. I think the disagreement is receipt by whom. And for you, it's an election official, and for your friend on the other side, it could be my neighbor. Is that a fair summary of your views? Because it seems to me you both agree that the final decision needs to be made by Election Day, which both of you, therefore, would permit early voting. I don't disagree much, but what I would say is my friend's position is a little bit more nuanced than that, because he thinks that sort of selection and submission to the somebody before Election Day is a necessary condition. But it's not sufficient, because Mississippi law cares very much about receipt by the registrar. And if the vote is submitted to the somebody before Election Day, but it's not received by the registrar until the sixth day, it's a nullity. So that's just the subtlety that I wanted to add. No, I appreciate that, because at least as I read Mississippi law, you're right, that it isn't accepted until an election official marks it accepted. That's its own rule. But it seems to be running away from that here by saying, at least as I'm understanding it, I might be misunderstanding it, but at least as I understand it, because they're saying, once it goes into FedEx or to my neighbor or whomever, it's received effectively on Election Day. See, I don't think they've quite gone that far, because they can try to quibble about the sort of receipt rule in the reg, but the statute itself absolutely requires receipt by the registrar within five days. And then the statute itself goes on to say that if it's not received by the registrar within five days, even though it was submitted, even though it went to FedEx, it's a nullity, and it must be destroyed. I mean, Mississippi takes its receipt deadline so seriously that if you miss their receipt deadline, your ballot is destroyed. If we were to rule against you, is there anything that would limit states from allowing receipt by election officials up until the day of the next Congress? Oh, the slippery slope problem on the other side, I don't think there's anything that would stop that. And, you know, maybe the next state can figure out a way to have an election without even anybody receiving anything. I don't know. But that seems to me to be a large reason for why Election Day should mean Election Day, and election should mean casting and receipt into official custody, to stop that slippery slope. On time, and how about means? Do you see any principled way we could draw a line on means and say, okay, common carriers are different than Bob? See, I think it's tricky, especially because all of these statutes purport to be time regulations, not manner regulations. And the thing to keep in mind is that under Article II, the congressional power is limited to time regulations. Manner is left to the states under Article II's election clause or electors' clause. So it's a little different than Article I, where Congress, if it wanted to, could correct the means. And so that's why I think it's either all or nothing in terms of their position, and they have no basis for distinguishing the states that say, like Illinois, that say 14 days with or without a postmark. By anybody. By anybody. Justice Kavanaugh? Can I follow up on General Stewart's who decides argument? I think if you were looking at the text in isolation, day for the election, the first instinct might be in-person voting on that day is what that text literally meant. But, of course, you acknowledge early voting. You acknowledge absentee voting are consistent with the statute. And then we have, obviously, a range of historical practices that deviate from that text, if you thought literally it meant in-person voting on that day. And then what General Stewart says is, well, given all that history, you can't read it literally. And I think Professor Morley's amicus brief says this as well. And you have to take account of that historical practice, and really it's up to Congress to fix this if they think there's a policy problem going on with the states. I think that's a summary of some of what he's saying. Leave it up to Congress for all these policy concerns. I just want to get your response to how we think about the historical practice in the text and then the who decides. Sure. So on the historical practice, the thing that I think is remarkable is this unbroken historical tradition, at least from 1845 to 1914, there is no example of somebody, of an election, with a state having a ballot receipt deadline that's other than by the election day. So nothing. I mean, they cobbled together one state at a time to get them starting in 1918, and I think some of those statutes are distinguishable, but it's common ground that there's nothing during the whole time that these statutes are enacted where you don't have ballot receipt by election day. So to me, if we're going to do original public meaning, and then, yeah, Congress could fix this either way. However you decide this case, you're not going to have the last word. Congress is going to have the last word. But if we're going to take original public meaning seriously, I think the reason Congress hasn't revisited this is because it doesn't have to. It's already fixed this problem. Now, in the Morley brief, you know, I would take the bitter with the sweet on that, which is what he says is, you know, I don't think the text gets you all the way there. I beg to differ. I think the text, original public meaning, gets you all the way there. But what he says should be the tiebreaker is what rule does a better job with dealing with actual or perceived fraud? And one of the things I found striking in that brief is he quotes Senator Atherton from 1844 debate leading to the 1845 statute. And Atherton says in response to some argument that, ah, well, you haven't proved all the fraud or whatever that was going on and the pipe laying scandals and all of those other things because it wasn't just crossing lines. And he says, real or perceived, it doesn't make a difference because even perceptions of fraud are going to make a huge difference in undermining public confidence in the elections. And you, I think, quoted from Professor Pildes, who I think got this exactly right. I mean, if you have an election and the election is going to turn on late arriving ballots in a way that means what everybody kind of thought was the result on election day ends up being the opposite a week later, 21 days later, the losers are not going to accept that result. Full stop. They won't. And that is bad for our system. And so if you think there's a little bit of ambiguity and we're in a post-Chevron world so you have to resolve it, I would resolve it in the favor of reading the statute to eliminate fraud or perceived fraud in election and that, I think, would cause you to rule it out. Why have so many states allowed this then? So states have only allowed it relatively recently is one of your questions, you know, averted to. I think one reason that they've done it is some states do want to accommodate overseas or military voters. I do think that there are other ways to do that than the ballot deadline as I've talked about, and I think Mississippi's voted with their feet. I don't think anybody's going to be disenfranchised in Mississippi when you can vote. Only if you're overseas, you can vote by email. So I think Mississippi solved that in a much more targeted way. So I think, you know, that's at least kind of part of the way that I would think about why states have done it, and then really the other, there was an uptick in COVID as sort of a one-time accommodation for COVID, and a lot of states did it for COVID and then sort of retreated. Mississippi, for whatever reason, stuck with what they did for the first time in COVID. You were asked about the 2000 election. I don't think you were able to finish that answer. Do you have more you want to say about that? Yeah, I mean, I just want to be emphatic that that is the reddest of red herrings because what happened in 2000 was that the voting deadline was extended pursuant to a consent decree, and the reason there was a consent decree is that Florida had violated the principal protection of UOCAVA, which is getting the absentee ballots to the voters overseas well in advance of the election. And so having blown that deadline, there was a consent decree that extended the receipt date. We don't have any quarrel with that. Federal courts have the authority to remedy violations of UOCAVA, and I don't think extending the deadline is off the table as a judicial remedy, though actually I think in 2026 as opposed to 2000, maybe the judicial remedy would be to let the UOCAVA voters vote by e-mail, even in a state unlike Mississippi that doesn't allow it. We looked at a majority of states allow overseas voter either fax or e-mail voting, so I think that would probably in 2026 that would be the better remedy, but in 2020, pursuant to consent decree, that was perfectly permissible. So anybody who tells you the 2000 election came out different is not looking at the facts of that Harris case and the consent decree. Last one, if you were to prevail here and say our decision was issued in June, Purcell issues with the states for the upcoming fall elections? I don't think so. I think this issue, because it really sort of just deals with the state and the receipt of the ballots, I think June would give them plenty of time. And remember, this issue only affects the general election. It doesn't affect primaries. So the only thing I can even think of that would raise like a lurking problem is you wouldn't want the states, if this court decides in our favor, you wouldn't want a state absentee ballot that's misleading about the receipt deadline, but those deadlines, those ballots have to go out 45 days before the general election. So what's that, like mid-September or something? So there's plenty of time. I don't think there's a Purcell problem. Thank you. Justice Barrett? So I'm trying to figure out how to think about the history. And you said a moment ago that what we have is the original public meeting of Election Day at the time in the late 19th century in 1917, et cetera, was ballot receipts. And you invoke the various state laws that required receipt by Election Day. But we don't have, to my knowledge, so this is what I want you to correct me if I'm wrong, a rich history of original public meeting in the way that we often think of it, of people saying or expressing views that, yes, this is what it means to elect, this is what Election Day means, stripped down to its essence. It means the taking of the ballot into official custody. What we have is state practices. I think there are a lot of really good policy reasons to require, and we've talked about some of those this morning, lots of good policy reasons to require all the ballots to be in by Election Day. Do we have evidence either of people saying, like, this is what we understand Election Day to require, as opposed to treatises that are summarizing some of the cases? And is there any reason to think that these laws were adopted because of a concern about preemption by federal law, as opposed to just, this is a really good policy, this is how elections should run? So we're in the realm of congressional actions under the Election Clause and the Electors Clause, so everything they're doing is preemptive, and that's particularly obvious in the context of trying to get a uniform national Election Day for the general election. So I think we're, like, in the absolute epicenter of intertribal here, because not only is it, like, sort of preemptive by its very nature, but it's Congress trying to create uniformity across state lines. So Congress was sort of appalled by what had happened with the staggered deadlines and disparate deadlines in the states. So I think the preemption part of that is kind of relatively straightforward. Now, on the history, this is where I just think the Civil War practice is so powerful, because my friend says, well, when they were first, you know, passed, like, the difference between casting and receiving the ballot into official custody hadn't ripened. But the Civil War ripened it. And the one thing every state, including Rhode Island and Nevada, did, is they said it has to be in some kind of official custody by Election Day. And I agree with you that's striking. And maybe I wasn't clear before. I agree with you that that's striking. But do we have any reason to think that they did that because they thought, well, it has to happen on Election Day or by Election Day, which is a deviation from what the text says, right? But do we have any reason to think that they did it because they thought they had to, as opposed to this is really good policy, so we should do it this way? No, I think we, I mean, to me, like, you know, can I connect the dots precisely? No, but, like, they did it because they thought that's what an election means, and that's what an Election Day means. They thought it would just be unthinkable. It would no longer be an election or an Election Day. It wouldn't be happening on Election Day if it could take place, if ballot receipt could take place some other time. Isn't that true of early voting, too? And I guess this goes back to Justice Kagan's question. I mean, it seems to me that if you look at the historical practice, what an election meant was showing up in person and casting your vote and being qualified as a voter on that same day. And then there were deviations for war, essentially. But why would absentee voting in a widespread way by civilians or early voting, why is that permissible? Because if we're just going to say that historically it needs to look like it always looked, how come those features fall out? I would say they probably fall out because nobody thinks they're essential, which is to say, you know, if a state wanted to have, like, early voting but, like, no voting on Election Day, maybe that would be a hard case. But, you know, those, I think, have been understood, and there's a different history for those because if a state wants to say you can come in and you can mark your ballot and put it into official custody a week early, that doesn't sort of vitiate the whole idea of an Election Day. Whereas if you can still have ballots being received after Election Day, I think that vitiates the whole notion of Election Day. And if you're interested in Professor Morley or Justice Kavanaugh's tiebreakers, there's not the same concerns about fraud, about the losers not being able to accept the outcomes when it comes to early voting. But there's a distinct problem with voting with ballots that come in, and particularly if they're going to tip an election, and as Justice Gorsuch indicated, like, maybe it's happened, maybe it hasn't, but it will. And at that point, there's just no way the loser is going, whoever it is, is going to accept that outcome, and the supporters aren't going to accept the outcome. And so that's something I just don't think is implicated by early voting. Justice Jackson? People accepted the possibility of that outcome for 100-plus years now because this idea of the votes being cast by Election Day and counted after Election Day has been around, right? It's not like we're talking about a brand-new thing from Mississippi from the standpoint of no one ever had a post-Election Day ballot deadline before. And so I guess I'm just concerned about the various conclusions that you would have us draw from these historical practices because it seems to me that we have a very long history of states having a variety of different ballot receipt deadlines to include after Election Day. So kind of three points about that. One is, I don't think it's true that there was this 100-year sort of pattern and nobody raised an objection. I think the Maddox case in 1944 is a powerful example that the idea that Election Day means Election Day is not something that only occurred to lawyers in the post-COVID world. The second thing I would say is, as a practical matter, if one or two states at one time in the 1920s had a law that deviated, maybe that's not something that really makes that big a difference. But in a world where some states essentially have all of the voting be absentee, lots of states have gone to no-excuse absentee voting, it may be that a lurking problem has just become much more obvious because of the magnitude of what's going on in the present day. I guess I don't understand why that isn't. The variety that you're describing isn't a strike against your view that Congress has precluded this. I mean, others of my colleagues have looked at or talked about Congress legislating in this area. They are obviously aware that there are states that are doing this and they have not spoken to it. They have not specifically precluded it. Now, you say that maybe that's because they assumed that Election Day in the federal statutes that we're examining from 100 years ago does the work, but Congress is today considering an election-related statute that would specifically prohibit this, which means that Congress probably didn't understand its existing legislation to do this. I mean, I haven't studied the current legislation. I think it probably does quite a bit more than this and probably affects other elections, like primary elections. I don't know for sure, though. I haven't studied it. But it does address this. It specifically addresses, and we're talking about the Make Elections Great Again Act, specifically addresses the idea of preempting state post-Election Day ballot deadlines. And so if that's true, then it seems as though Congress doesn't believe that its current legislation has done this work. Well, Congress probably doesn't know how this court is going to decide this case, so it probably can legislate against that veil of ignorance. Right. The worry is that you want this court to decide the case rather than have Congress do it. No, and that's... I mean, two things I think are important. However this court decides this case, Congress has the power to revisit it. That's, I think, common ground among the parties. The second thing that's common ground among the parties is that the federal Election Day statutes preempt something. And so the only question is, what do they preempt? Do they just preempt casting ballots and giving it to the mail service, as my friend suggests, which, as Justice Gorsuch elucidated, leads to a huge slippery slope problem, or does it require both submitting and receipt into official custody? Everybody agrees it preempts something. How do you respond to the notion that when we look, as the Society for Rule of Law Institute suggests that we do, at historical practices with respect to electors, and specifically Congress in 1787 adopting a resolution establishing that, quote, the day fixed for the election of the president, end quote, that that's the day on which the electors will vote and transmit their votes, and that the president of the Senate would receive their votes at a later date. So the concept of casting one's vote versus the receipt of the vote was very early on distinguished. Yeah, but I actually think that example works in our favor because what's going on there is there are essentially two separate sort of elections, if you will, or processes that are being adjudicated or overseen by different sovereigns. So what happens first is the states address the appointment of the electors in that state, and then later that has to be received and certified in the Senate because then in the Senate they're going to figure out who won the national election. Yes, I appreciate that, but I guess I'm just talking about this notion that receipt and casting have always been completely intertwined such that it would be inconceivable for someone to think that the election day is the date in which the votes are cast versus the day in which they're received by election officials. So I don't dispute that if you have two really separate elections that you can then, having bifurcated the elections, you can bifurcate the idea of casting and receiving. Right, but Congress could have had them on both the same day if that's what an election is. I mean, your argument is rooted in this notion that as a common sense matter, as a general matter, if we're going to have an election day, that's the day when everything is supposed to happen. And this demonstrates that whether you call it two elections or not, the casting of the votes can happen temporally, separately from the receiving of the votes for the purpose of saying who won the election. That's, I think, pretty clear in the historical record. So it seems odd to me that we are to assume that when Congress set an election day, it necessarily precluded the states from saying in our state we're going to consider election day to be the date of casting the votes and that we will, as Mississippi has done, and continue to receive them up to a certain period afterwards. So I still think you're eliding, with all due respect, you're eliding that there are kind of two separate elections there. And in all the states, when they elected the electors for the president election, they cast the ballots and received the ballots instantaneously in that state. Then there's a separate process for getting the results from the states to the national election and figuring out how it was all processed. I don't think in 1792 that could have happened instantaneously. I think it took a while to get from Georgia to the seat of government in order for that to happen, and so Congress understandably provided an interval there. But I think for the election of the electors in the states, the casting and the receipt would have been simultaneously. They might well have been doing it by putting beans in a bowl back in 1792. But I think, as the parties agree, by about 1845, certainly by 1872, the process of voting by ballot had been well established, and those were cast and received instantaneously. Thank you. Thank you, Counsel. General Sauer. Mr. Chief Justice, and may it please the Court, as the argument so far reflects, Mississippi's theory of election is so general and permissive that it would authorize statutes that Congress could not possibly have approved in the 19th century. Defining election as merely private choice alone would authorize statutes where the voters mark their ballots and give them to a private party, such as a ballot harvester or a party operative, or even hand them in three weeks later and just say or attest that they made the decision on Election Day. Official receipt is at the definitional heart of election. Every source from the 1840s onward that addresses the specific question treats official receipt as essential to an election. Mississippi cites a few definitions that are too general to address the question, but they cite no authorities holding that a vote can be perfected by anything other than official receipt. I welcome the Court's questions. General Sauer, what effect would your approach have on early voting? We agree with both sides that early voting is still acceptable, and we agree in particular that Mr. Kline said that early voting has two things in favor of it, a distinct historical pedigree that really starts. I think as he emphasized there in those Civil War practices that were before the 1872 Congress, and also as all the Courts of Appeals who addressed this, the three cases that addressed this just after 2000, after Foster, all concluded that that is what this Court was referring to when it talked about consummation in footnote 4. The Court left open the possibility that it does have this better historical pedigree, that there could be a process where ballots are being received earlier, but that ballot box has to close on Election Day. I'm not sure I understand exactly how that answer is responsive to the point that if the Election Day is the voting and taking, that has to be that day. So maybe I just missed it, but it seems to me maybe you're not saying anything other than, well, that's different. It's a challenging question, but I point the challenge is even greater for Mississippi. I mean, Judge Kleinfeld does wrestle with this in Kiesling. He thinks it's a really tough question, and he does come out, as every court does, in favor of early voting. It's a much tougher problem conceptually for Mississippi, because Mississippi's definition is it's all private action. The private action occurs when you mark that ballot, when you put it in the mailbox or give it to a common carrier. Of course, that obviously extends over many days, so they can't handle the word day in the election statute. We think that conceptualizing it as the Courts of Appeals cases do, as there's a process, that process is consummated, it's finalized, it's perfected is the term they use in the congressional record in 1844. It's perfected on Election Day, the ballot box closes, and we think that's the best way to address early voting. But General, if I might, I think the reason it's a tougher question for you is because you started off by phrasing the question this way. You said those election rules are not ones Congress could possibly have conceived of or approved. That's not their question. That's your question. That you're saying we have to go back to the mid-19th century and say could Congress have possibly conceived of this kind of rule. And Congress couldn't have conceived of the kind of early voting we have now. It couldn't have conceived of a thousand other ways in which we administer elections now. And so I think it really is a problem for you as to how you draw this line and say, well, this is across the line, but all these other things that we do differently now from the way we used to do them in the 19th century, those don't worry about. I disagree with that. And the reason I disagree with it is the Civil War practices, proxy voting has this aspect of the private choice happening earlier. So early voting is already in the forefront of the mind, forms of early voting at least, are already in the forefront of the mind of Congress. If you said to Congress, do you think that the Civil War provides a precedent for early voting generally among the civilian population, I think they would have laughed at you. They saw early voting as like something you did for soldiers in the field, not as like, oh, this is going to be great precedent for any old citizen getting her ballot three weeks ahead of time and mailing it in. I strongly agree with that in a sense that, repeating what Mr. Clement said, which is that you have a practice that involves early voting, but you also have states taking these herculean, extraordinary efforts to make sure that the ballot boxes, the votes are received in the ballot box, closes on election day, whether it's soldiers like going in the front and giving their votes over to, you know, de jure election officials who are actually commanding officers, or whether or not it's submitting them in that proxy voting practice. What happens in proxy voting? I guess you're sort of not really quite grasping. Maybe it's my fault, like what my question is. It's like why this practice, but no other practices? And, you know, for example, Mr. Clement was asked about verification practices. Do those, too, have to happen on election day? And I think Mr. Clement, credibly enough, said, not my case, kind of maybe they do. I mean, once we go down this road, once we say that these statutes which don't say anything actually have some significant preemptive effect, where are we going to end up? I think my answer to that is that the ordinary indicators of original public meaning from the 19th century do grapple repeatedly, surprisingly repeatedly, grapple with the question of whether or not receipt is essential to election. So Leroy gets fully, describes it as the essential thing in election is casting in receipts. We've cited 11 cases, you know, three treatises, five dictionaries. Whenever they get to the point of considering whether casting and receipt are required, they unanimously, there's this impressive consensus, they all say casting and receipt. Mississippi has no 19th century source, no source at any time prior to 1918 that says a vote is cast by anything less than official receipt. So there actually is a surprising consensus in the 19th century authorities that cuts in our direction, and that's reinforced by the efforts the states took during the Civil War to ensure that receipt occurred on election day. So you put those two together and you come to, I think, a very powerful place, really surprisingly powerful evidence of original public meaning on this specific discrete question, even though no one had done it yet. In all these other contexts where really you see the 19th century authorities, they have to peer to the definitional bone, really, for example. In the Steinware case, a voter comes into the polls and he's got three votes folded together, and he gets qualified, and he's trying to put them in the ballot box, and they stop him right there, and they say, this looks a little thick, and they open it up, and there's three, and he's indicted, because he's trying to stuff the ballot box right there. And he says, I never voted, because it never went in the ballot box. And the courts grapple with that. They take that argument very seriously. Where they come down is official receipt, when you've made the offer to vote and you give it to the election official, that constitutes voting. So you have the early, the 19th century sources looking at stuff that's very, very similar in the sense of detail of the issue presented here, and every single one of them comes up with casting and receipt are required for voting. Yes, but since then, we have many states that have departed from that, to include Mississippi. And since we're talking about preemption and Congress' ability to make this determination, it just seems very odd that in the period of time since when these statutes were passed and today, we now have pretty common practice among many states to allow for absentee voting in this way, early voting, all these other things, but in particular, post-election day ballot receipt deadlines. And Congress has not indicated, at least thus far, that it intended ever to preempt this, that it intended not to have the states make this determination. As far as I know, this kind of challenge hasn't even been brought. This has just been accepted. So how is it that we focus in, hone in, right in the 19th century, and that's the relevant practice that you want us to consider, and not the more recent practices, the practices of everybody understanding what election day means to include this kind of thing? Mississippi admits that every single one of those examples occurs after the relevant period when all these statutes are enacted. But I guess I'm asking you, why is that the relevant period? I mean, we have lots of statutory interpretation scenarios in which Congress passes statutes, and I think it's rare that we interpret those statutes relative to the practices of the people who were affected by them at the time. I thought we normally do things like textualism. We look at the statutes, and some of us think about the legislative history and what Congress's intent was when we're interpreting the statute. I don't recall, and maybe we have, but I'm just curious about this really heavy reliance on the 19th century understanding of the word election day, especially when we have a more recent understanding that has been implemented and Congress hasn't said anything about it. I would say the 19th century evidence of meaning is the best evidence of the original public meaning of the statutes at the time they were adopted in 1845. And you're saying that governs. We have to interpret election day, notwithstanding that Congress may have wanted states to experiment, that states have experimented and done other things. We are bound, you say, by exactly what election day people thought it meant at the time these statutes were enacted. By its original public meaning. And, of course, Congress was very concerned when it passed these statutes in 1845 and 1872 about the exact thing that Mississippi, or almost the exact thing that Mississippi would allow, which is staggered ballot receipt deadlines. Thank you, counsel. Justice Thomas. Justice Alito. Justice Sonomayor. Tell me what the act is that you think has to be done by election day by the official. Received or accepted? Received. All ballots have to be received and the ballot box has to close on election day. The ballot box has to close. Yeah, the proverbial ballot box. What do we do, and I know you did this, and I am a little upset, not a little, a lot upset, by many of the statements in your brief quoting historical sources out of context, but the Payne's Treatise on the Law of Elections to Public Officers, you claim, had a traditional rule was that the legal votes duly offered at the polls but not actually deposited in the ballot box cannot be counted. But I look to that treatise and it says in some of the states that is the rule, but that in others, and also for the U.S. House of Representatives, the rule was the opposite. As Payne wrote, it was in 1888, an established rule of the House of Representatives of the United States that a vote duly offered and unlawfully rejected, so it wasn't accepted, at the polls will be counted in a contest even if not accepted by officials on election day. And we have another source you cite, the American and English Encyclopedia of Law, you selectively quote from that snippet that the quote, active voting was not complete until the ballot was deposited in the box. But it made very clear that that was only the rule in Alabama, while noting that other states allowed votes to be counted even if the officer may neglect to deposit the ballot in the box until after the close of polls. So it seems as if your rule is already historically destroyed at the time of these examples that you quote to us. I respectfully disagree and I stand by exactly how we characterize those sources and all the historical sources in our brief. If you go to the Payne treatise, and I think we refer to this in the very next sentence in our brief, the Payne treatise says the traditional rule is it's got to actually be deposited, but then it notes later in the 19th century some authority says, well, you know, if they challenge your qualifications and they're wrong, as long as they received it, either way it's official. Receipt is what matters. The state has it in its custody. Now you're changing the definition. Well, we've said receipt is the word that we use. We've used that consistently, and that Payne treatise points out that either way, whether it's got to actually be in the ballot box or officially received, official receipt is essential to an election. And so do all three of the treatises, all five of the legal dictionaries, including the one you referred to. Justice Kagan, Justice Gorsuch, Justice Kavanaugh, Justice Barrett, Justice Jackson. Thank you, Counsel. Thank you. Rebuttal, Mr. Stewart. Thank you, Mr. Chief Justice. I'd like to do my best to make three points. First, there was a concession by Mr. Clement that I was surprised about because it seemed to be different from what he said in his brief. He said he'd have no objection to doing what the U.S. Solicitor General proposes on UCAVA. I just want to briefly make clear, as we've said in our briefs, that if this Court agrees with the Solicitor General on UCAVA, that means vacater would be required because the Fifth Circuit did not allow state laws allowing UCAVA votes to arrive after Election Day. Second, I want to try to tie together some points and go back to Justice Barrett's questions, Justice Kagan's questions, Justice Sotomayor's questions, some other questions about 19th century history here. My friend, Mr. Clement, emphasized, the Solicitor General did as well, hey, you know, those show that you needed ballot receipt. I think the key point to recognize there is that ballot receipt was not possible in the 19th century without somebody showing up in person and undergoing an on-the-spot qualifications check. If you need ballot receipt, you need those other things as well, and that's quite critical to the plain meaning in this case. I think the better view is that, hey, when people were holding elections in person at the time, naturally they were going to be receiving ballots on Election Day. That doesn't mean that that was required or baked into an election any more than in-person voting or on-the-spot qualification checks by fellow voters is baked into an election. I would add, Justice Sotomayor, you mentioned some things, pain, treatise, and otherwise. I would also say if you look at the Solicitor General's sources, they emphasize not just voter choice, but they also emphasize that at the time the method of making that choice was in person, on-the-spot qualification checks, those kind of things. Those are not things you really see quoted or cited in the Solicitor General's brief, but they bear out what we've said about Mr. Clement's 19th century election codes. I'd say that also this history explains the Civil War receipt of absentee ballots. Mr. Clement alluded to the idea that states went to Herculean efforts to receive ballots on Election Day. That's not what they went to Herculean efforts to do. They went to Herculean efforts to hold elections effectively in person because that is the method of voting that people used at the time. That's why field voting was so dominant. And the other thing that states were trying to do at the time was to adhere to actual or perceived in-person, in-district voting requirements. So that's what they were doing. They were holding elections where people would cast ballots in person, which was the common standard way. And when that's happening, yes, naturally ballots are going to be received by Election Day. That did not make it a right issue or a settled issue. It did not decouple ballot receipt from ballot casting, but it did not proclose that either. Last thing, I just want to refer to your neighbor again, Justice Gorsuch. You know, I want to be clear. You know, we have not made the argument for the neighbor to be allowed to cast ballots, but I will say that I would emphasize my friends do allow the neighbor to cast their ballot. The neighbor just needs to be designated, I think, as Mr. Clement put it, cloaked with government authority. You know, it's quite something for a neighbor, a party boss, you know, some bad actor to be able to become a ballot receiver just because they're cloaked with state authority. And, you know, if that's allowed, then I don't see why the historically recognized for 100 years method of casting a ballot through the mail would not be equally legitimate, especially when the federal government itself is perfectly fine with that method and Congress has been fine with that method for United States tax returns, which, like, carries huge civil and criminal consequence, also are very critical on deadlines. I think the best way to resolve this case is to come back to the text, history, and precedent, which we've said many times, just does not decide the key issue. This is ultimately a federalism case. The question is whether, as I think Justice Jackson put it, did Congress in 1845 block states from adopting a practice that no one had wide reason to consider at the time? Congress wasn't thinking about it. It didn't decide that. It didn't wall states off from doing that. We ask the Court to reverse.  Thank you, Counsel. The case is submitted.